IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BILLY J. VICKERS,
     Plaintiff,

vs.                               Case No. 3:08cv78/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.    PROCEDURAL HISTORY

Plaintiff filed an application for SSI on October 18, 2005, alleging disability since November 15, 2003 (Tr. 17).[1]  Plaintiff's application was denied initially and on reconsideration (Tr. 17,

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on May 23, 2008 (Docs. 12, 13).

49–53).  On July 13, 2007, following a hearing, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not under a disability as defined under the Act (Tr. 17–25).  On January 4, 2008, the Appeals Council denied Plaintiff's request for review (Tr. 5–7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  *See* Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

On July 13, 2007, the ALJ made several findings relative to the issues raised in this appeal (Tr. 17–25):

1) Plaintiff has not engaged in substantial gainful activity ("SGA") since October 18, 2005, the date he filed his application (20 C.F.R. §§ 416.920(b), 416.971 *et seq*.).

2) Plaintiff has the following severe impairments: lumbar disc disease and pain disorder associated with a general medical condition (20 C.F.R. § 416.920(c)).

3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

4) Plaintiff has the residual functional capacity ("RFC") to perform light work, which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; standing or walking, off and on, for a total of approximately six hours in an eight-hour workday; and sitting for six hours in an eight-hour workday.

5) Plaintiff is unable to perform any past relevant work (20 C.F.R. § 416.965).

6) Plaintiff was born on November 6, 1959, and was 44 years on the date he alleges he became disabled, which is defined as a younger individual, aged 18–49 (20 C.F.R. § 416.963).

7) Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills (*see* Social Security Ruling ("SSR") 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9)      Considering Plaintiff's age, education, work experience, and RFC, there are jobs that
        exist in significant numbers in the national economy that Plaintiff can perform (20
        C.F.R. §§ 416.960(c), 416.966).

10)     Plaintiff, therefore, has not been under a disability, as defined in the Act, since
        October 18, 2005, the date his application was filed (20 C.F.R. § 416.920(g)).

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision
is supported by substantial evidence from the record and was a result of the application of proper
legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may
reverse the decision of the [Commissioner] only when convinced that it is not supported by
substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan,
125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A
determination that is supported by substantial evidence may be meaningless . . . if it is coupled with
or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983),
superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214
(11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will
not be disturbed if in light of the record as a whole the decision appears to be supported by
substantial evidence.  42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote
v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but
not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate
to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.
2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L.
Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the
evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d
1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the
Commissioner's decision, the decision must be affirmed if supported by substantial evidence.
Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits (DIB) or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S MEDICAL HISTORY

A.    Relevant Medical History — Physical

On January 31, 2005, Plaintiff presented to Barry A. Barrett, M.D., reporting chest pain that radiated into his left shoulder and jaw, as well as dizziness, lightheadedness, and low back pain (Tr. 146).  Plaintiff brought x-rays with him, and after reviewing the x-rays Dr. Barrett noted severe degenerative disc disease ("DDD") in the lumbosacral spine with scoliosis, "which could be leading to [Plaintiff's] problem" (*id.*).  Plaintiff also reported some shortness of breath when lying down and noted that he smoked a 2.5 packs of cigarettes a day for more than thirty years, but he stated that quit smoking a year ago (*id.*).  Plaintiff additionally reported only occasional use of alcohol, but Dr. Barrett found this report "somewhat suspicious" (*id.*).  An EKG revealed some ischemia, but a normal sinus rhythm (*id.*).  Upon physical examination, Dr. Barrett detected some tenderness in the low back and positive straight leg raise, worse on the left than the right (*id.*).  Plaintiff had pain that radiated into his left arm when he put his head back.  Dr. Barrett's assessment was "questionable compromised cardiac symptoms," and he scheduled a Stress Thallium test for February 7, 2005, to rule out cardiac problems and administered samples of Arthrotec (*id.*).  Plaintiff was advised to refrain from the use of alcohol and cigarettes (*id.*).

Upon referral from Dr. Barrett, Plaintiff underwent a nuclear myocardial scan on February 7, 2005, by P.J. Anderson, M.D., a radiologist (Tr. 149–50).  Objective findings revealed ejection fraction at forty-one percent with adequate contractility, although there was a slight decrease in contraction in the base of the left ventricle (Tr. 149).  Dr. Anderson's impression was "apical redistribution on the horizontal long axis and to a less[er] degree the vertical long axis sequences, there is thinning of the inferior wall, which may be scarring, [and] there is some reversible filling defect in the inferior wall on the vertical long axis and the short axis sequences" (Tr. 149–50).  Dr. Anderson expressed that this was a positive study and should be correlated clinically, to include consideration of further cardiologic evaluation (Tr. 150).

On February 14, 2005, Plaintiff returned to Dr. Barrett reporting left neck pain that went into his left arm and numbness that went into his arm when he turned his head to the left (Tr. 145).

Plaintiff also reported trouble sleeping, as well as anxiety, stating that any little noise "sets him off" (*id.*).  Examination revealed clear lungs, a regular heart beat without murmur, and full range of motion in the upper extremities, although Plaintiff complained of pain "when going above 90 degrees on the left" (*id.*).  Dr. Barrett offered Plaintiff physical therapy or an orthopaedic consult, but Plaintiff was not "interested" (*id.*).  Dr. Barrett provided samples of Ambien for insomnia and Toprol for hypertension and anxiety, and he administered a prescription for an Albuterol inhaler and continued Plaintiff's Ultram and Arthrotec for pain.  At that time, Plaintiff weighed 272 pounds (*id.*).

Plaintiff returned for a follow-up appointment on March 21, 2005 (Tr. 143).  It was noted that Plaintiff had "positive thallium" and left arm pain on the stress test (*id.*).  Dr. Barrett also noted that Plaintiff had been taking Toprol but discontinued it because he could not afford it.  Plaintiff noted that when he stopped taking Toprol his left chest pain returned.  Plaintiff also explained that he gets very short of breath and weak when he attempts to do exertional activities.  Dr. Barrett's impression was coronary artery disease, hypertension, asthma, and unknown cholesterol status.  Dr. Barrett prescribed Metoprolol, which he noted was less expensive than the Toprol, and he continued the Nitroglycerine and Albuterol (*id.*).

On April 5, 2005, Plaintiff presented to Thomas E. Young, M.D., of the Southeast Cardiology Clinic, on referral from Dr. Barrett (Tr. 109).  Plaintiff reported experiencing chest discomfort, describing it as a sharp pain (*id.*).  He also described experiencing "pressure pain" that radiates down the left arm, occurs at rest and with activity, and is associated with sweating and shortness of breath but no nausea (*id.*).  Dr. Young commented that a Cardiolite GXT showed apical redistribution and reversible ischemia in the inferior wall, which he considered a "positive study" (*id.*). Plaintiff's past medical history included hypertension, chronic obstructive pulmonary disease ("COPD"), anxiety disorder, history of treatment for tuberculosis ("TB"), and history of alcoholism (noting Plaintiff's report that "he quit one year ago") (Tr. 109–10).  Plaintiff's current weight was 271 pounds (Tr. 110).  Dr. Young's impression was atypical chest pain with abnormal Cardiolite GXT (graded exercise test), must rule out coronary artery disease; hypertension, well controlled; COPD with previous heavy tobacco use; and anxiety disorder (*id.*).  Dr. Young planned to perform a cardiac catheterization, and it was scheduled for two weeks later (Tr. 111).

On April 19, 2005, Plaintiff underwent the cardiac catheterization.  Dr. Young characterized the procedure as a "left heart catheterization, left ventriculography, and selective coronary arteriography," the results of which were as follows:  normal left main coronary artery, normal left anterior descending coronary artery, normal circumflex coronary artery, normal right coronary artery, and normal left ventricle in size, shape, and contractility with an ejection fraction greater than 60% — overall, a "negative study" (Tr. 123–24).  Upon release, Plaintiff was advised to lift no more than fifteen pounds for the next three to five days and to follow up with Dr. Young in a month (Tr. 116–17).  Dr. Young's final diagnoses included unspecified chest pain with normal coronary arteries, hypertension, COPD, anxiety disorder, history of treated TB, history of alcoholism, and dyslipidemia with elevated cholesterol (Tr. 114).  Upon discharge, Dr. Young prescribed Lopressor and advised Plaintiff to take one aspirin daily (*id.*).

On December 20, 2005, Plaintiff presented to Vijay C. Vyas, M.D., for a consultative examination at the request of the Social Security Administration (Tr. 157).  Plaintiff described experiencing back and leg pain, explaining that he injured his back in 1992 and again in 1997 performing construction work (*id.*).  Plaintiff reported that his pain had gradually worsened to the extent he was now experiencing back pain all the time, and he was now experiencing pain in his knees (*id.*).  Plaintiff noted that his pain was exacerbated by prolonged periods of standing or walking or by bending and picking up objects.  Plaintiff stated that he could walk one to two blocks slowly before having to stop, and he reported experiencing shortness of breath (Tr. 157–58).  Dr. Vyas commented that Plaintiff's main problem was his lower back and bilateral knee pain (Tr. 157).  Plaintiff stated that he had not been able to receive adequate treatment for his impairments because he cannot afford it.  However, Plaintiff also reported that he had Nitroglycerine at home but "doesn't take it" (Tr. 158).  Dr. Vyas also noted that Plaintiff was "supposed to be taking Vytorin, but he hasn't taken it in a long time" (*id.*).  Additionally, Dr. Vyas recorded Plaintiff's comment that he "drinks about six cans of beer every day" (*id.*).  Upon physical examination, Dr. Vyas noted that Plaintiff weighed 288 pounds (*id.*).  Plaintiff's head, pupils, sinuses, mouth, and throat were all normal, as was movement of the lungs and neck (Tr. 159).  Respiratory examination revealed some wheezing, "but nothing very remarkable," and Plaintiff was not coughing, did not appear to be in any respiratory distress, and had no sign of congestion (*id.*).  Dr. Vyas noted that Plaintiff's

shoulders, elbows, wrists, and fingers were normal, with no deformity or swelling, although Plaintiff complained of "slight pain at the wrist and elbow area" (*id.*).  Musculoskeletal examination revealed tenderness over both knees, with more tenderness in the right knee and slight swelling in the left knee.  Dr. Vyas detected some crepitus in the knees and observed that Plaintiff walked cautiously (*id.*).  Dr. Vyas' impression was poorly controlled essential hypertension, history of heavy smoking with some degree of COPD and shortness of breath, lumbosacral pain (probable degenerative joint disease), and knee pain (possibly gout) (Tr. 160).  Also on December 20, 2005, two radiographs of Plaintiff's right knee were taken, which revealed "very mild to mild osteoarthritic changes vs. old traumatic arthritic changes of the right knee" (Tr. 161).  Otherwise, the radiographs were normal (*id.*).

On September 5, 2006, Plaintiff presented to J.W. Johnson, M.D., reporting pain in both knees and muscle cramps in both legs (Tr. 187).  Plaintiff also described experiencing difficulty breathing, noting frequent spells of shortness of breath but no history of cough (*id.*).  A musculoskeletal examination revealed "good motion of all joints" (*id.*).  Additionally, Plaintiff's lungs were clear with no wheezing or rales, and his heart had regular rhythm with no murmurs (Tr. 187).  Moreover, two views of Plaintiff's chest, taken September 7, 2006, revealed clear lungs, a "normal chest," and normal heart and pulmonary vascularity (Tr. 192).  Dr. Johnson's impression was dyspnea, history of hyperlipidemia, and osteoarthritis (Tr. 187).  Dr. Johnson administered prescriptions for Prilosec, Naproxen, and Trazodone (Tr. 188).

On September 19, 2006, Plaintiff returned to Dr. Johnson, stating he is "unable to work and is trying to get disability" (Tr. 186).  Plaintiff reported difficulty "getting his breath," as well as muscular aches and pains in most of his muscles (*id.*).  Plaintiff also reported that he was not sleeping well (*id.*).  Dr. Johnson's impression, in pertinent part, was restrictive lung disease and arthralgias, and he increased Plaintiff's dosage of Trazodone (to "50 mg 2 QHS #60's x's 4," which means that Plaintiff was to take two pills each night), continued Lopressor, and prescribed Toprol and Arthrotec (*id.*).  Plaintiff missed his next two appointments with Dr. Johnson, which were scheduled for October 19, 2006, and November 7, 2006 (*id.*).

Plaintiff next returned to Dr. Johnson on January 23, 2007 (Tr. 185).  Plaintiff reported experiencing "arthralgia type pains all of the time located in various areas and joints of his body"

(*id.*).  It was noted that Dr. Johnson's office had given Plaintiff Trazodone, but Plaintiff reported taking "just one every night," instead of two as prescribed, and Plaintiff was advised to take more (*id.*).  Plaintiff's heart and lungs were clear, no joint abnormalities were observed, and Plaintiff seemed to have a complete range of motion in all of his joints (*id.*).  Dr. Johnson's impression was restrictive lung disease, arthralgias, and hypertension, and he continued Plaintiff's Trazodone, Toprol, and Arthrotec (*id.*).

Plaintiff returned to Dr. Johnson on February 9, 2007, reporting continued muscle aches and pains (Tr. 184).  Plaintiff also reported that he was not taking the Trazodone because he did not like the side effects, such as dry mouth and drowsiness (*id.*).  Plaintiff was assessed with fibromyalgia, hypertension, and hyperlipidemia (*id.*).

On March 9, 2007, Dr. Johnson's impression remained fibromyalgia, restrictive lung disease, hypertension, and hyperlipidemia (Tr. 199).  Dr. Johnson noted that Plaintiff was started on Crestor two weeks earlier and that "he has been doing pretty well but has scattered aches and pains" (*id.*).  Plaintiff was advised to lose weight, provided with prescriptions for Zoloft, and continued on Crestor, Toprol, and Prilosec (*id.*).  Finally, on May 10, 2007, Dr. Johnson commented that Plaintiff continued to experience aches and pains, but they seemed no worse than usual (Tr. 198).  Plaintiff reported that he was "doing well" on his medications, and he again had complete range of motion in his neck, shoulders, and upper extremities (*see id.*).  Dr. Johnson's impressions remained the same, and Plaintiff was continued on Zoloft, Crestor, Toprol, and Prilosec (*id.*).

B.     Relevant Medical History — Mental

On  December  15,  2005,  Plaintiff  presented  to  Robert  A.  DeFrancisco,  Ph.D.,  for  a psychological evaluation at the request of the Social Security Administration (Tr. 153).  Because Dr. DeFrancisco's opinions are at issue in this appeal, the details of this examination will be provided, *infra*, in the "Discussion" section of this Report and Recommendation ("R & R").

C.     Other Relevant Information Within Plaintiff's Claim File

An agency physician completed a Psychiatric Review Technique form on January 9, 2006 (Tr. 162–75).  Plaintiff's psychiatric condition was evaluated under Section (or "Listing") 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Affective Disorders) and Section 12.07 (Somatoform Disorders) (Tr. 162).  The reviewing physician opined that neither condition satisfied the diagnostic

criteria of the Listings (Tr. 165, 168, 173).  As a result of Plaintiff's disorders, however, the physician opined that Plaintiff would have mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of deterioration or decompensation (Tr. 172).

A Physical RFC Assessment form was completed on January 20, 2006 (Tr. 176–83).  The agency physician opined that Plaintiff can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit about six hours in an eight-hour workday (Tr. 177).  Further, Plaintiff has the unlimited ability, subject to the foregoing restrictions, to push or pull (*id.*).  Plaintiff, however, has frequent postural limitations (i.e., in his ability to balance, kneel, or crawl) and occasional limitations with climbing, stooping, and crawling, but he has no manipulative, visual, or communicative limitations (Tr. 178–80).  Finally, Plaintiff has no environmental limitations, except to avoid concentrated exposure to temperature extremes and fumes, odors, gasses, and poor ventilation (Tr. 180).

Plaintiff's hearing before the ALJ was held on June 13, 2007 (Tr. 205–18).  In pertinent part, Plaintiff testified that he was being treated for depression and fibromyalgia by Dr. Johnson (Tr. 210–11).  He noted that he presently weighed 271 pounds and that he suffers from lung disease, which causes shortness of breath and prevents him from being around chemicals or smoke and dust (Tr. 209, 211).  Plaintiff testified that he has pain on a daily basis and rated it as being "between 6 and 7" on a ten-point scale (Tr. 212).  He stated that he takes Orthotex for pain, but it affects his abilities to concentrate and work, as does his depression (Tr. 213–14).  Plaintiff also claimed to be able to sit for only thirty minutes at a time and walk only "3 or 4 blocks at the most" (Tr. 212–13).  Additionally, Plaintiff stated that he had not consumed any alcoholic beverages in more than 1.5 years (Tr. 216).  Finally, a vocational expert testified, but because her opinions are at issue in this appeal her testimony will be summarized, *infra*, in the "Discussion" section of this R & R.

V.    DISCUSSION

Plaintiff raises three issues in the instant appeal.  First, Plaintiff contends the ALJ erred in his consideration of the opinions of Dr. DeFrancisco (Doc. 16 at 9–11; *see also* Doc. 22 (Plaintiff's reply brief, which is limited to this issue)).  Second, Plaintiff asserts that the ALJ failed to pose a

complete hypothetical question to the vocational expert (*id.* at 10–11).  Third, Plaintiff alleges that the ALJ committed reversible error by failing to consider Plaintiff's obesity (*id.* at 10, 12–13).

A.      Dr. DeFrancisco

As noted *supra*, on December 15, 2005, Plaintiff presented to Dr. DeFrancisco for a consultative examination (Tr. 153).  Plaintiff drove to the examination from Florala, Alabama, which, Dr. DeFrancisco noted, "is a several hour drive" (*id.*).  Plaintiff advised Dr. DeFrancisco that he was applying for DIB based on "trouble walking, standing, and sitting for periods of time," and it was noted that Plaintiff has COPD (*id.*).  Plaintiff further stated that he has severe DDD in the lumbosacral spine with scoliosis, which began to "flare up" about a year and a half earlier (*id.*).  Plaintiff advised that he was in "constant pain," with pain in his hips, knees, arms, and chest, but a chest catheterization was negative (*id.*).  Similarly, Plaintiff reported problems with pain "all over his body," primarily in his hips, legs and spine, noting that he constantly turns and moves and has trouble sleeping because of pain (Tr. 154).  Plaintiff also reported "a history of drinking" but stated that he had not had anything to drink in about a year and had not smoked in "the last year or two" (Tr. 153).  Moreover, Plaintiff advised Dr. DeFrancisco that he had not previously had any "psychiatric intervention," but he reported "problems with depression and worry because of his financial situation" (*id.*).

Upon mental status examination, Dr. DeFrancisco observed that Plaintiff was cooperative throughout the evaluation, his speech was intelligible and coherent without any speech impediment, and his "affective expression was appropriate to thought content" (Tr. 154).  Plaintiff was oriented as to person, place, date, time, and situation, and he knew the current and former Presidents of the United States (*id.*).  Additionally, Plaintiff was able to "accomplish serial 3's and 7's without incident," spell forward and backward, make change and solve mathematical problems, repeat six digits forward and four backward, repeat three objects immediately and after a five-minute interval, and he had no problems with concentration or following directions during the examination (*id.*).  Similarly, Plaintiff had no problems with remote memory, and he had an adequate vocabulary and "fund and range of knowledge" (*e.g.*, he knew the capitals of Alabama and the United States, the number of days and weeks in a year, and that Labor Day is in September), as well as adequate thought processes, thought content, judgment, and insight (*e.g.*, Plaintiff was able to interpret

proverbs and explain why doctors must be licensed) (*see* Tr. 154–55).  When asked to describe his daily activities, Plaintiff stated that he was in pain all the time and could not sleep very well, but he admitted that he does household chores "as tolerated," including washing, cooking, ironing, and vacuuming (Tr. 155–56).  In diagnosing Plaintiff, Dr. DeFancisco commented that he had read the forms that accompanied his authorization to perform the examination and considered them in his overall diagnosis (Tr. 156).  Dr. DeFrancisco opined that "Plaintiff's diagnosis is consistent with (1) Pain Disorder Associated with General Medical Condition, (2) Adjustment Disorder NOS versus Major Depression related to problem number 1, and (3) history of physical problems, including COPD, atypical chest pain and severe scoliosis with severe [DDD] in the lumbosacral area" (*id.*).  In conclusion, Dr. DeFrancisco stated that it appears Plaintiff is "more disabled from a physical point of view than a psychological point of view," and further, that Plaintiff's problems stem mostly from his physical limitations (*id.*).  Dr. DeFancisco continued, stating "Obviously, if [Plaintiff is] physically unable to work that should be deferred to the M.D.'s.  I believe he probably would have difficulty, however, based on the data and forms read, handling work pressure at this time.  Restriction of activity and constriction of interest appear to be marked at this time." (*id.*).  Finally, Dr. DeFranciso opined that Plaintiff would be able to handle financial benefits if awarded (*id.*).

Plaintiff contends that the ALJ erred by failing to properly evaluate the "belief" of Dr. DeFrancisco that Plaintiff would have difficulty handling work pressures, and Dr. DeFrancisco's opinion that "restriction of activity and constriction of interest appear to be marked at this time" (*see* Doc. 16 at 10).  Specifically, Plaintiff alleges that these opinions conflict with the ALJ's determination that Plaintiff "could handle the work requirements of [SGA] on a sustained basis," and the ALJ was required to "state with particularity the weight assigned" to the opinions and why they were not adopted (*id.*).

A review of the ALJ's opinion reveals that the ALJ thoroughly summarized Dr. DeFrancisco's examination and the results thereof, including the opinions at issue here, as well as Dr. DeFranciso's diagnoses (*see* Tr. 22).  The ALJ concluded, however, that Plaintiff had no severe mental impairment (Tr. 22–23).[3]

---

[3]The ALJ also noted Dr. Young's diagnosis of anxiety (Tr. 21).  However, as the court is well aware, a diagnoses of anxiety alone is insufficient to establish severity at step two.  *See, e.g.*, <u>Salles v. Comm'r. of Social Security</u>, 229 Fed. Appx. 140, 145 (3d Cir. 2007) (diagnoses alone, including diagnosis of depression, insufficient to establish

At step two of the sequential evaluation process, the claimant must prove that he is suffering from a severe impairment or combination of impairments which significantly limits his physical or mental ability to perform "basic work activities." *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a).  Basic work activities include: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and capacities for seeing, hearing, and speaking; as well as mental functions such as understanding, carrying out, and remembering simple instructions; the use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).  An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account").  Although the claimant carries the burden at step two, the burden is mild.  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ( "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.").  A claimant need only show that "her impairment is not so slight and its effect is not so minimal."  *Id.*

Here, although the ALJ cited the two opinions of Dr. DeFrancisco that are at issue, he did not specifically "evaluate" them.  The undersigned concludes, however, that the ALJ's ultimate findings are supported by substantial evidence, including his finding that Plaintiff has no severe mental impairment, and that any failure by the ALJ to specifically evaluate the two opinions constitutes harmless error.  The record reveals, as Plaintiff admitted to Dr. DeFrancisco, that Plaintiff had no prior "psychiatric intervention" and that he was sent to Dr. DeFrancisco for a consultative examination at the request of the Social Security Administration.  A claimant's failure to seek treatment is a proper factor for the ALJ to consider.  *See* Watson v. Heckler, 738 F.2d 1169,

---

severity at step two) (The undersigned cites Salles only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* U.S. Ct. of App. 11th Cir. Rule 36-2, 28 U.S.C.A.)

1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing).  Furthermore, absence of treatment indicates that a mental impairment is non-severe.  *See, e.g.*, Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).  Likewise, because Dr. DeFrancisco was not "treating" Plaintiff and examined him on only one occasion, his opinion is not entitled to deference.  *See* McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).

   Moreover, in finding that Plaintiff's mental impairments were non-severe and that Plaintiff would not be "preclude[d] . . . from all work activity," the ALJ noted that Plaintiff "had no problems with concentration or following directions during [Dr. DeFrancisco's] exam, and that [Plaintiff's] immediate, recent and remote functions were intact" — statements that are fully supported by the record (*see* Tr. 23, 154–55).  Further, because the ALJ fully summarized the report of Dr. DeFrancisco, he was well aware that the remainder of Plaintiff's examination by Dr. DeFrancisco was normal.  Indeed, the examination revealed that Plaintiff's mental ability to perform basic work activities, such as using judgment and understanding, carrying out, and remembering simple instructions, is not limited, much less "significantly limited."  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a),(b).

   The ALJ also noted Dr. DeFranciso's opinions that Plaintiff's problems and limitations stemmed more from a physical point of view than a psychological point of view (*see* Tr. 22–23).  Indeed, the "data and forms" read by Dr. DeFrancisco, and on which he based his opinions, must have been documents or records related to Plaintiff's physical conditions because Plaintiff had no prior psychiatric intervention.  Moreover, Plaintiff's primary complaints to Dr. DeFrancisco concerned his pain and physical condition (*see* Tr. 155).  For example, Plaintiff advised Dr. DeFrancisco that he was applying for disability benefits based on pain and trouble walking, standing, and sitting (*see* Tr. 153).  Similarly, in a disability report Plaintiff specifically listed, as the "illnesses, injuries, or conditions that limit [his] ability to work," the following: his back, knees, feet, high blood pressure, breathing, heart, and arthritis (Tr. 66).  In the same disability report, Plaintiff was asked to describe how these conditions limit his ability to work, and he responded by describing only physical limitations and stating that he quit working because of swelling in his joints (*see* Tr. 66–67).  *See* 20 C.F.R. § 404.1512 (requiring that a claimant "bring to our attention everything that

shows that you are . . . disabled").  Although Plaintiff referenced his depression during his testimony before the ALJ, he did not originally state it as a basis for his claim of disability, and his primary complaints to his physicians were consistently related to his physical condition.  Furthermore, as noted by the ALJ, Plaintiff reported that his depression and anxiety were related to his lack of money.  *See* Gaddis v. Chater, 76 F.3d 893, 895–96 (8th Cir. 1996) (element of secondary gain in plaintiff's conduct belies his sincere belief that he is truly disabled and unable to perform any substantial gainful activity).

        For all these reasons the ALJ's "non-severe" finding at step two is fully supported by the record.  In short, Plaintiff failed to prove that he is suffering from a severe mental impairment which significantly limits his ability to perform basic work activities.  Thus, any error by the ALJ in failing to specifically evaluate the opinions of Dr. DeFrancisco that are at issue here is harmless, because the ALJ's ultimate findings, including those made at step two, are fully supported by the record.[4]  *See* East v. Barnhart, 197 Fed. Appx. 899,  901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . .").

---

        [4]This conclusion is bolstered by the fact that the Vocational Expert identified unskilled work as work Plaintiff could perform (*see* Tr. 217), and unskilled work is defined in the Regulations as follows:

> [W]ork which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 404.1568(a).

B.        Hypothetical Questioning of the Vocational Expert ("VE")

During Plaintiff's hearing, the ALJ asked a hypothetical question of the VE that assumed an individual of Plaintiff's age and education, who could no longer perform work at a <u>heavy</u> exertional level, but could perform work at a <u>light</u> exertional level (Tr. 217).  The VE testified that the hypothetical individual could perform work activities and specifically stated that there would be jobs in the light, unskilled category that could be performed (*id.*).  The ALJ posed another hypothetical question, asking whether the hypothetical individual could perform work activity if he was in pain, but the pain could be controlled with medication (*id.*).  Again, the VE testified that the hypothetical individual could perform work activity (*id.*).  Specifically, the VE indicated that the hypothetical individual could perform the jobs of cleaner/housekeeper, production assembler, and cashier (Tr. 217–18).  And, according to the VE, there were 1,473,000 cleaner/housekeeper jobs in the national economy, 333,680 production assembler jobs in the national economy, and 1,735,000 cashier jobs in the national economy (*id.*).

A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  <u>Pendley v. Heckler</u>, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported.  *See* <u>McSwain v. Bowen</u>, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

Here, Plaintiff contends that the ALJ erred in his questioning of the VE.  Specifically, Plaintiff argues that "[d]espite finding that [Plaintiff] suffered from the medically severe impairments of **lumbar disc disease** and **pain disorder** associated with a general medical condition," the ALJ asked only "if an individual is in pain, and that pain can be controlled with medication," could he perform work (Doc. 16 at 11) (emphasis in original).  Plaintiff also suggests that the ALJ's hypothetical question is improper because it essentially implies that Plaintiff has no pain during the day, which is inconsistent with a diagnosis of severe DDD (*see id.*).  Plaintiff's argument is not entirely clear, although he essentially appears to assert that his medically severe impairments necessarily cause pain and preclude work, which is inconsistent with the ALJ's findings (*se*e Doc. 16 at 11).

As previously noted, the ALJ found that although Plaintiff could no longer perform work at the heavy exertional level, he could perform work at the light exertional level, and his pain was controlled to the extent that it did not preclude all forms of SGA.  Because the ALJ's questions to the VE were based on these findings, the undersigned will consider the ALJ's RFC finding and his findings regarding Plaintiff's pain.

The ALJ determined that Plaintiff retained the RFC to perform light work, or work involving lifting no more than twenty pounds at a time, with frequent lifting or carrying of objects weighing up to ten pounds; standing or walking, off and on, for a total of approximately six hours in an eight-hour workday; and sitting for six hours in an eight-hour workday (Tr. 19).  In determining this RFC, and in finding that Plaintiff's complaints of pain were not fully credible, the ALJ considered, in accordance with the requirements of 20 C.F.R. § 416.929, and SSRs 96-4p and 96-7p, "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . ." (Tr. 19).  The ALJ then concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [the symptoms related to his medically determinable impairments] are not entirely credible" (Tr. 20–21).

In support of his findings, the ALJ noted Dr. Barrett's physical examination of Plaintiff on February 14, 2005, which was essentially normal (Tr. 21, 145).  The ALJ also referenced the April 19, 2005 cardiac catheterization, which Dr. Young characterized as a "negative study," and the largely negative radiographs of Plaintiff's right knee from December 2005 (Tr. 21–22, 123–24, 161).  Similarly, the ALJ discussed the results of Dr. Vyas's consultative examination, which revealed some crepitus and tenderness in the knees, as well as some slight swelling in the left knee, but was otherwise unremarkable (Tr. 22, 157–60).  Additionally, the ALJ noted Plaintiff's examination by Dr. Johnson, in May 2007, which was "essentially within normal limits," as well as medical records reflecting that Plaintiff's medications were generally effective, because most of Plaintiff's examinations revealed clear lungs and complete ranges of motion (Tr. 23, 198–99).  Indeed in March 2007, Dr. Johnson noted that Plaintiff had "been doing pretty well," despite some scattered aches and pains, and on Plaintiff's last visit with Dr. Johnson in May 2007, Plaintiff's medications were noted to be "doing well," and Plaintiff had complete range of motion in his neck, shoulders, and upper extremities (Tr. 198–99).  Although not determinative of a claimant's credibility alone, an

ALJ is permitted to consider the objective medical signs and laboratory findings, or lack thereof, when determining a claimant's credibility.  *See* 20 C.F.R. § 404.1529(c).

Further, the ALJ noted Plaintiff's failure to follow medical advice, such as declining Dr. Barrett's offer of an orthopaedic consult or physical therapy (Tr. 21, 145).  Similarly, Plaintiff was advised by Dr. Barry in January 2005 to refrain from the use of alcohol, but Plaintiff reported to Dr. DeFrancisco in December 2005 that he was drinking six beers per day (Tr. 146, 158).  Likewise, Plaintiff did not take the recommended dosage of Trazodone at night, claiming that it gave him a dry mouth and made him drowsy (even though Plaintiff complained of insomnia), and he reported to Dr. Vyas that he had Nitroglycerine at home but "doesn't take it" (Tr. 158, 184–86).  *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability); *see also* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . .").  Although Plaintiff reported on occasion that he could not take certain medications because he could not afford them, the record also reflects that Plaintiff disregarded medical advice when he had certain medications or when money was not an issue (for example, when samples were provided to Plaintiff or he otherwise obtained medication but simply decided not to take it, or drank alcohol against medical advice).  As noted by the ALJ, "some of [Plaintiff's] noncompliance is because he decided on his own not to take the medicine without advice or knowledge from his doctors" (Tr. 23).  Finally, the ALJ noted that Plaintiff's testimony that Orthotex affects his ability to concentrate was belied by the report of Dr. DeFranciso, which clearly demonstrates that Plaintiff had no impairment in his ability to concentrate (*see id.*).  Similarly, Plaintiff's testimony that he can sit for only thirty minutes at a time, is likely contradicted by Plaintiff's report to Dr. DeFrancisco that he drove to the examination, which is a "several-hour" drive.[5]

Based on the foregoing, the ALJ found that Plaintiff's pain was reasonably controlled with medication, a finding that is supported by the record, and the ALJ determined Plaintiff's RFC, a determination that is also consistent with the evidence as a whole, including the opinions of the

---

[5]Theoretically, Plaintiff could have stopped every thirty minutes en route to the examination, but he did not report this to Dr. DeFrancisco — he stated only that he drove, even though he was accompanied by his girlfriend (*see* Tr. 153).

agency reviewer (*see* Tr. 176–83).  The ALJ then posed a hypothetical question to the VE, which contained the limitations he found credible and supported by the record (Tr. 24–25, 217–18). Because the VE's testimony was given in response to a hypothetical question that contained the limitations the ALJ found credible and supported by the record, the ALJ properly relied on the VE's testimony in reaching the conclusion that Plaintiff was not disabled.  *See* Welch v. Bowen, 854 F.2d 436, 440 (11th Cir. 1988).  Thus, the undersigned finds no error with regard to the ALJ's hypothetical questioning of the VE.

To the extent Plaintiff contends that the ALJ's hypothetical question "conflicts" with Plaintiff's diagnosis of "severe degenerative disc disease" (*see* Doc. 16 at 11), the court has found nothing in the record to support the conclusion that DDD precludes the performance of light work activity, nor has Plaintiff pointed the court to any such evidence.  Indeed, with the exception of Dr. DeFrancisco, no physician offered an opinion suggesting that Plaintiff was precluded from work. To the contrary, upon release from the heart catheterization, Plaintiff was advised by Dr. Young to lift no more than fifteen pounds for only the next underline three to five days (Tr. 116–17).  *See* Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) ("There is no indication in the treatment notes that [] any of [the claimant's] doctors restricted his activities, or advised him to avoid prolonged standing or sitting."); Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995) (in discounting claimant's allegation that he "needed a two-hour nap each day," ALJ considered fact that he never reported this to his physician, and no physician opined that he was disabled); Singleton v. Astrue, 542 F. Supp. 2d 367, 379 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled," and plaintiff received only conservative, routine, care).

C.      Obesity

As Plaintiff's last ground for relief, Plaintiff contends that the Commissioner's decision should be reversed because the ALJ erred by "ignoring" Plaintiff's obesity at step two of the sequential evaluation (Doc. 16 at 12–13).  In support of his argument, Plaintiff references his testimony at the hearing that he weighed 271 pounds, as well as evidence in the medical records documenting Plaintiff's weight (*id.* at 12).  Plaintiff then relies on a district court opinion, Williams

v. Barnhart, 186 F. Supp. 2d 1192, 1198 (M.D. Ala. 2002), in which the court found that an ALJ erred in failing to consider a claimant's obesity at step two, even though the claimant had not listed obesity as one of her impairments (Doc. 16 at 12).  Plaintiff also cites SSR 02-1p, for the proposition that obesity will be considered a severe impairment, when alone, or in combination with another medically determinable impairment, it significantly limits a claimant's physical or mental ability to do basic work activities (*id.*).

Initially, SSR 02-01p specifically states that there is "no specific level of weight or [body mass index] that equates with a "severe" or a "not severe" impairment."  *See* http://www.ssa.gov/OP_Home/rulings/di/01/SSR2002-01-di-01.html.  Thus, to the extent Plaintiff contends that his weight alone compels a finding of severity at step two, Plaintiff's argument fails.

While obesity can cause functional limitations in some individuals, Plaintiff has merely cited his weight and offered generalizations about the <u>possible</u> effects of obesity (*see, e.g.,* Doc. 16 at 12 (Plaintiff alleges that obesity <u>can</u> cause physical functional limitations)).  Plaintiff has not established that he has any actual limitations caused by his obesity.  Moreover, the undersigned has found no evidence in the record demonstrating that limitations have been placed on Plaintiff as a result of his weight, and Plaintiff has not pointed to any such evidence in the record.  Further, Plaintiff did not allege obesity as a basis for disability and appears to simply argue that his DDD and crepitus in the knees support his claim that his obesity is a severe impairment (*see* Doc. 16 at 13), but there is no evidence that the DDD or crepitus were caused or exacerbated by Plaintiff's weight. As noted by the Third Circuit, a remand for the ALJ's failure to mention a claimant's obesity is not required when, like here, it would it would not affect the outcome of the case.  Rutherford v. Barnhart, 399 F.3d 546 (3d Cir. 2005) (remand not required where claimant never mentioned obesity as a condition that contributed to her inability to work, even when directly asked to describe her impairments, and she only generally alleged that her weight made it more difficult for her to stand, walk, and manipulate her hands and fingers); *see also* Skarbek v. Barnhart, 390 F.3d 500 (7th Cir. 2004) (remand not required where claimant did not specifically claim obesity as an impairment, either in his disability application or at his hearing, and although references to his weight in the medical records were likely sufficient to alert the ALJ to the impairment, the claimant did not specify how his obesity further impaired his ability to work, but merely speculated that his weight

makes it more difficult to stand and walk).  Furthermore, Plaintiff's reliance on <u>Williams</u>, 186 F. Supp. 2d at 1192, is misplaced.  In <u>Williams</u>, the claimant had been repeatedly diagnosed as obese, and on at least one occasion she was diagnosed as morbidly obese, and at least two physicians had advised her to lose weight, but despite the diagnoses and recommendations the ALJ did not consider her obesity when determining whether she had severe impairments at step two.  <u>Williams</u>, 186 F. Supp. 2d at 1198.  In the instant case, not only is there is no evidence that limitations have been placed on Plaintiff's functioning as a result of his weight, Plaintiff has never been diagnosed with obesity, much less diagnosed as being morbidly obese or repeatedly diagnosed as obese.[6]

Lastly, as previously noted, Plaintiff references a part of SSR 02-1p that discusses the combined effects of obesity with other impairments.  A pertinent part of the ruling, however, states that the Agency "will not make assumptions about the severity or functional effects of alleged obesity combined with other impairments."  *See* SSR 02-1p.  Indeed, "[o]besity in combination with another impairment <u>may</u> or <u>may not</u> increase the severity or functional limitations of the other impairment."  *Id.* (emphasis added).  The ruling also explains that "[t]he fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments."  *Id.*  Here, there is no evidence in the record that Plaintiff complained of limitations stemming from obesity, and there is no evidence in the record that Plaintiff complained that any of his other alleged impairments were exacerbated by obesity.  The ALJ, therefore, committed no error in failing to delve into that area.  In conclusion, Plaintiff has failed to meet his burden of showing that his alleged obesity is "severe" within the meaning of the Act, <u>McDaniel</u>, 800 F.2d at 1030–31, the ALJ did not err in failing to find it severe at step two, and Plaintiff is not entitled to relief on this ground.

---

[6]Although the record contains several references to Plaintiff's weight, and on one occasion Plaintiff was advised to lose weight, the record contains no <u>diagnosis</u> of obesity,.  *Cf.* <u>Bowser v. Comm'r of Soc. Sec.</u>, 121 Fed. Appx. 231 (9th Cir. 2005) (unpublished opinion) (holding that the ALJ did not err in failing to discuss obesity where, among other factors, plaintiff did not claim it as disabling, there was no medical diagnosis of obesity (although one physician opined that plaintiff appeared "moderately obese"), plaintiff (like here) did not raise the issue of obesity or attest to associated symptoms in her administrative hearing testimony, and no physician opined that plaintiff's weight caused her afflictions or symptoms).  While not binding on this court, the undersigned finds the reasoning of <u>Bowser</u> persuasive.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this <u>6</u><sup>th</sup> day of February 2009.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**